IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| DEBORAH ANN GROSSMAN, | ) | CASE NO.  1:22-CV-00537-JDG |
| | ) | |
| Plaintiff, | ) | |
| | ) | **MAGISTRATE JUDGE** |
| vs. | ) | JONATHAN D. GREENBERG |
| | ) | |
| COMMISSIONER OF SOCIAL | ) | **MEMORANDUM OF OPINION AND** |
| SECURITY, | ) | **ORDER** |
| | ) | |
| Defendant. | ) | |

Plaintiff, Deborah Grossman ("Plaintiff" or "Grossman"), challenges the final decision of Defendant, Kilolo Kijakazi,[1] Acting Commissioner of Social Security ("Commissioner"), denying her application for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 416(i), 423, and 1381 *et seq.* ("Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and the consent of the parties, pursuant to 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.  PROCEDURAL HISTORY

In May 2019, Grossman filed an application for POD and DIB, alleging a disability onset date of November 23, 2018, and claiming she was disabled due to complications from chemotherapy, inability to stand or walk for long periods of time due to chemotherapy, dizziness due to chemotherapy, migraines due to chemotherapy, inability to drive due to neuropathy from chemotherapy, severe neuropathy due to chemotherapy, and pain and numbness to hands and feet due to chemotherapy.  (Transcript ("Tr.") at 13, 60.)  The application was denied initially and upon reconsideration, and Grossman requested a hearing before an administrative law judge ("ALJ").  (*Id.* at 13.)

---

[1] On July 9, 2021, Kilolo Kijakazi became the Acting Commissioner of Social Security.

1

On November 12, 2020, an ALJ held a hearing, during which Grossman, represented by counsel, and an impartial vocational expert ("VE") testified.  (*Id.*)  On February 10, 2021, the ALJ issued a written decision finding Plaintiff was not disabled.  (*Id.* at 13-26.)  The ALJ' s decision became final on February 14, 2022, when the Appeals Council declined further review.  (*Id.* at 1-6.)

On April 5, 2022, Grossman filed her Complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 7-9.)  Grossman asserts the following assignment of error:

> (1) The ALJ's RFC determination is not supported by substantial evidence because he failed to properly develop the record regarding Plaintiff's physical impairments and resulting limitations.

(Doc. No. 7.)

## II.     EVIDENCE

### A.     Personal and Vocational Evidence

Grossman was born in May 1971 and was 49 years-old at the time of her administrative hearing (Tr. 13, 25), making her a "younger" person under Social Security regulations.  *See* 20 C.F.R. § 404.1563(c).  She has at least a high school education.  (Tr. 25.)  She has past relevant work as a licensed practical nurse.  (*Id.* at 24.)

### B.     Relevant Medical Evidence[2]

On August 22, 2018, Grossman saw Belagodu Kantharaj, M.D., for an oncology consultation following a recent right-sided breast cancer diagnosis.  (*Id.* at 467.)  Dr. Kantharaj noted a screening mammogram had revealed a 1 cm mass in the right breast, a diagnostic mammogram on July 27, 2018, revealed a 1.5 cm mass in the right breast, and a biopsy on July 31, 2018, revealed invasive ductal carcinoma, ER-ve, PR-ve, and Her2/Neu unknown.  (*Id.*)  Grossman underwent a right breast lumpectomy

---

[2] The Court's recitation of the medical evidence is not intended to be exhaustive and is limited to the evidence cited in the parties' Briefs.

2

and sentinel lymph node sampling on August 9, 2018, which revealed invasive ductal carcinoma measuring 1.2x0.8 cm, Grade 3 with foci of necrosis, and sentinel lymph nodes were negative for mets. (*Id.*)  Dr. Kantharaj diagnosed Grossman with malignant neoplasm of the lower-outer quadrant of the right female breast and estrogen receptor negative status.  (*Id.* at 469.)  Dr. Kantharaj recommended adjuvant chemotherapy with radiation to follow.  (*Id.*)

Grossman began chemotherapy on September 17, 2018.  (*Id.* at 211.)

On October 29, 2018, Grossman saw Dr. Kantharaj for follow up.  (*Id.* at 214.)  Grossman reported diarrhea, leg and arm cramps the first week after chemotherapy, a rash on her head and face, and dizziness for one week after chemotherapy.  (*Id.* at 216.)  On examination, Dr. Kantharaj found scalp alopecia and an erythematous macular rash over the face and head.  (*Id.*)  Dr. Kantharaj prescribed hydrocortisone cream and hydroxyzine as needed for the rash, Imodium as needed for diarrhea, and meclizine as needed for dizziness.  (*Id.* at 218.)

On November 19, 2018, Grossman saw Dr. Kantharaj for follow up.  (*Id.* at 220.)  Grossman reported fatigue, hot flashes, shortness of breath on exertion, constipation, nausea, a rash on her scalp, dizziness, numbness, tingling of hands for two days after chemotherapy, and loss of balance.  (*Id.* at 222.) On examination, Dr. Kantharaj found normal reflexes and coordination and no rash.  (*Id.*)  Dr. Kantharaj started Grossman an Decadron.  (*Id.* at 224.)

Grossman continued to see her oncologists weekly through February 2019.  (*Id.* at 479-537.)  On December 7, 2018, Grossman reported fatigue, hot flashes, shortness of breath on exertion, rash over her scalp, constipation, nausea, dizziness, loss of balance, and numbness and tingling of her hands for two days post chemotherapy.  (*Id.* at 481-82.)  On examination, Patrick Litam, M.D., found scalp alopecia, normal reflexes, and normal coordination.  (*Id.* at 482.)  On December 14, 2018, Plaintiff reported similar symptoms, as well as myalgias and an increase in hot flashes.  (*Id.* at 486-87.)  On examination, Dr.

3

Kantharaj found scalp alopecia, pale conjunctivae, normal reflexes, sensory deficit, and normal coordination. (*Id.* at 487.) Dr. Kantharaj noted Grossman was "tolerating chemotherapy very well except for myalgia, hotflashes [sic], nausea and mild peripheral neuropathy." (*Id.* at 488.) On December 21, 2018, Grossman reported similar symptoms along with worsening hot flashes and headaches. (*Id.* at 489, 492.) Dr. Kanatharaj found similar findings on examination in addition to an erythematous maculopapular rash over the scalp and face. (*Id.* at 492-93.) On January 11, 2019, Grossman reported similar symptoms, as well as intermittent nosebleeds, ankle swelling, and nail changes. (*Id.* at 506, 508.) On examination, Dr. Kantharaj found scalp alopecia, no edema or tenderness, normal reflexes, no cranial nerve deficit, normal coordination, and papular rash over the face. (*Id.* at 509.) On January 25, 2019, Grossman reported similar symptoms, as well as weakness and an unsteady gait at times. (*Id.* at 517, 519.) On examination, Dr. Kantharaj found scalp alopecia, no edema or tenderness, normal reflexes, sensory deficit, and normal coordination. (*Id.* at 520.) Dr. Kantharaj noted Grossman's peripheral neuropathy was getting worse and started her on Gabapentin. (*Id.* at 520-21.) On February 1, 2019, Dr. Litam noted Grossman "[s]till has moderate to severe peripheral neuropathy" and prescribed neuropathic cream. (*Id.* at 522, 526.) Grossman completed chemotherapy on February 22, 2019. (*Id.* at 543.)

On February 28, 2019, Grossman saw Suzanne Russo, M.D., for a radiation evaluation. (*Id.* at 258.) Grossman reported fatigue, weakness, occasional shooting pains in the right breast, back pain, chronic degenerative joint disease, alopecia, occasional vertigo, and peripheral neuropathy from chemotherapy. (*Id.* at 263.) On examination, Dr. Russo found no lymphedema, full motor strength, and normal muscle tone. (*Id.* at 264.) Dr. Russo recommended adjuvant right breast radiation to begin on March 11, 2019. (*Id.*)

Grossman underwent radiation of the right breast from March 11 through April 5, 2019. (*Id.* at 335.)

On April 12, 2019, Grossman saw Vagesh M. Hampole, M.D., for an initial evaluation of her joint pain.  (*Id.* at 352.)  Grossman complained of pain in her shoulders, elbows, wrists, hands, knees, hips, ankles, and feet for the past three weeks.  (*Id.*)  Grossman reported daily pain that was worse at times, as well as morning stiffness, although she denied any joint swelling.  (*Id.*)  Grossman told Dr. Hampole activity helped the pain, while resting made it worse.  (*Id.*)  Grossman denied alopecia and muscle weakness.  (*Id.*)  Grossman reported associated symptoms of fatigue, sleep problems, numbness and tingling in her hands and feet, stiffness, and joint pain.  (*Id.*)  On examination, Dr. Hampole found sensory deficit, normal motor system, good range of motion of the cervical spine, good range of motion of the shoulders, elbows, wrists, hands, hips, knees, ankles, and feet with no acute pain and no swelling or deformities, tender areas over the upper border of the trapezius muscles, low back, upper anterior chest, arms, forearms, upper lateral thighs, and below the medial knees, no muscle weakness, and no edema.  (*Id.* at 353.)  Dr. Hampole diagnosed Grossman with stable polyarthralgia and stable fibromyalgia.  (*Id.*)  Dr. Hampole ordered bloodwork.  (*Id.*)

On April 18, 2019, Grossman saw Jessica Hone, D.O., for numbness in her feet that Grossman reported was from her chemotherapy.  (*Id.* at 363.)  Grossman also reported neuropathy in her hands and feet and joint pain that was not from chemotherapy.  (*Id.*)  Grossman described the numbness and tingling as sudden, occurring for days, and increasing.  (*Id.*)  On examination, Dr. Hone found abnormal sensation of the feet bilaterally, normal breathing effort, and no edema.  (*Id.* at 364.)  Dr. Hone noted Grossman had started amitriptyline that day and told Grossman to schedule a follow up appointment if there was no improvement or worsening of her symptoms.  (*Id.* at 365.)

On May 30, 2019, Grossman saw Dr. Kantharaj for follow up.  (*Id.* at 433.)  Grossman reported a 10-pound unexpected weight loss, arthralgias and joint swelling of the wrists and elbows, dizziness, numbness and tingling of the hands and feet that were worse, severe intermittent headaches, loss of

5

balance, recent falls but no injury, and a dysphoric mood.  (*Id.* at 436.)  On examination, Dr. Kantharaj found normal range of motion, no edema, no cervical adenopathy, no sensory deficit, and normal mood and affect.  (*Id.* at 437.)  Grossman was to return in three days for an office visit, blood work, and port flush.  (*Id.* at 438.)

On June 14, 2019, Grossman saw Abdallah Kabbara, M.D., for complaints of back pain.  (*Id.* at 449.)  Grossman rated her current pain level as a 4/10, a 0/10 at the best, and 8/10 at the worst.  (*Id.*)  Dr. Kabbara noted Grossman had last been seen in 2015 with similar complaints, and Grossman reported the injections she received at the time "provided her with [a] significant amount of pain relief."  (*Id.*)  Grossman began experiencing low back pain again in November 2018 after completing her chemotherapy sessions.  (*Id.*)  Grossman reported completing physical therapy in March with no significant improvement.  (*Id.*)  An anti-inflammatory medication provided no benefit.  (*Id.*)  Grossman reported falling in the past six months as a result of her neuropathy from her chemotherapy, although the fall did not result in injury.  (*Id.*)  Grossman denied needing assistance with sitting, standing, or walking.  (*Id.*)  Grossman denied using an assistive device.  (*Id.*)  On examination, Dr. Kabbara found normal flexion and extension of the back, some tenderness to palpation of the facet joints, no tenderness to palpation of the SI joints, full range of motion of the extremities, no pedal edema, normal sensation, normal motor examination, and absent reflexes.  (*Id.* at 452.)  Dr. Kabbara recommended an x-ray of the lumbar spine and lumbar epidural steroid injections.  (*Id.* at 453.)

On August 30, 2019, Grossman saw Dr. Kantharaj for an oncology follow-up.  (*Id.* at 562, 565.)  Grossman reported improving numbness and tingling in her fingers, but continued numbness and tingling in her feet without improvement.  (*Id.*)  Grossman denied limb weakness, dizziness, and tremors, but endorsed paresthesias, numbness of hands and feet, headaches, and a recent fall.  (*Id.* at 563.)  On examination, Dr. Kantharaj found no joint tenderness or swelling, no muscle tenderness, and peripheral

neuropathy.  (*Id.* at 564.)  Grossman's diagnoses consisted of polyneuropathy due to drug and malignant neoplasm of lower-outer quadrant of right breast of female, estrogen receptor negative.  (*Id.*)  Grossman was to return in three days for an office visit, blood work, and port flush.  (*Id.* at 565.)

On December 3, 2019, an EMG nerve conduction study revealed sensory neuropathy with absence of sensory nerve conduction studies with near normal motor nerve conduction studies.  (*Id.* at 594.)  The EMG findings suggested "small fiber neuropathies, which will be related to chemotherapy, though other causes of neuropathy must be ruled out."  (*Id.*)

On December 30, 2019, Grossman saw James Spindler, M.S., for a consultative psychological examination.  (*Id.* at 455.)  Grossman told Spindler the reason she was applying for disability benefits was because she had breast cancer.  (*Id.*)  Grossman reported living with her husband and son, and that she had a good relationship with them and all of her family members.  (*Id.* at 456.)  Grossman told Spindler she had an active driver's license.  (*Id.*)  Grossman reported suffering from Stage One breast cancer and neuropathy in her hands and feet.  (*Id.*)  Grossman told Spindler she did not believe she could work because she could not think clearly enough because of chemotherapy fog.  (*Id.* at 457.)  Grossman reported waking up at 6:30 a.m., letting the dog out, and then eating breakfast.  (*Id.* at 458.)  During the day, she washed dishes, vacuumed, did laundry, and cared for the dog.  (*Id.*)  Grossman did not belong to any social organizations, she did not nap, and she did not have significant problems with anxiety or depression.  (*Id.*)  Grossman reported hobbies of reading, solving word games, and watching sports.  (*Id.*)  Grossman recounted ten friends she was in contact with, although she had not been out socializing much since her cancer diagnosis.  (*Id.*)  She cooked dinner for family every night and watched TV until she went to bed.  (*Id.*)  On the weekends, Grossman ran errands and shopped for groceries.  (*Id.*)

On examination, Spindler found a slow, steady gait, appropriate dress, average grooming, cooperative behavior, normal speech, adequate thought associations, good eye contact, no depression,

optimism about the outcome of her breast cancer since it was caught early, and full orientation.  (*Id.* at 457-58.)  Grossman recalled five out of five objects after five minutes, accurately recited six digits forward and three backward, and correctly determined the amount of change she should receive if she purchased seven twenty-cent mints and paid using five dollars.  (*Id.* at 458.)  Grossman demonstrated average intelligence, adequate level of knowledge for most aspects of daily living, and reliable judgment for most routine matters.  (*Id.*)  Spindler opined Grossman seemed capable of understanding, remembering, and carrying out instructions in most job settings, appeared to have the mental ability to sustain a working pace and maintain a level of attention and concentration sufficient for most job settings, seemed capable of responding appropriately to supervision and coworkers, and seemed capable of responding appropriately to routine work pressures.  (*Id.* at 459-60.)

On February 14, 2020, Grossman saw Dr. Litman for an oncology follow up appointment.  (*Id.* at 559, 561.)  Grossman again reported improving numbness and tingling in her fingers, but continued numbness and tingling in her feet without improvement.  (*Id.*)  Dr. Litman noted Grossman's peripheral neuropathy remained "persistent" despite her completion of chemotherapy in 2019.  (*Id.*)  Grossman again denied limb weakness, dizziness, and tremors, but endorsed paresthesias, numbness of hands and feet, headaches, and a recent fall.  (*Id.* at 560.)  On examination, Dr. Litman found no joint tenderness or swelling, no muscle tenderness, and peripheral neuropathy.  (*Id.* at 560-61.)  Dr. Litman noted Grossman was "[c]linically stable," "[p]eripheral neuropathy [was] still a problem," and that Grossman was on Gabapentin/Lyrica.  (*Id.* at 561.)  Grossman was to return in four months.  (*Id.*)

On May 14, 2020, Grossman saw Joni Lyn Ruffner, CNP, for evaluation of leg swelling and color change for the past four months.  (*Id.* at 585.)  Grossman reported she had peripheral neuropathy of her lower extremities because of chemotherapy.  (*Id.*)  Grossman complained of swollen feet and ankles, a feeling of heaviness in her lower legs, change of color of her toenails (red and bluish-purple), and

occasional feet coldness.  (*Id.*)  While her symptoms began occasionally in February 2020, Grossman reported her symptoms were now occurring almost daily.  (*Id.*)  Grossman complained that standing caused her feet to swell more and her feet were "slightly edematous" in the morning, which had never happened before.  (*Id.*)  Grossman reported taking Lyrica without relief and elevating her legs without relief.  (*Id.* at 585-86.)  Grossman denied using compression stockings.  (*Id.* at 586.)  Grossman also complained of dizziness, lightheadedness, numbness and tingling in the feet, and headaches, although she denied weakness.  (*Id.* at 588.)  On examination, Ruffner found no cyanosis of the lower extremities, warmth to touch of the lower extremities, no dermatitis, pulses palpable to the lower extremities, no skin discoloration of the lower extremities, and mild non-pitting edema of the lower extremities bilaterally. (*Id.*)  Ruffner ordered an arterial ultrasound of the lower extremities with a plan for a lower extremity venous workup after the results of the arterial ultrasound.  (*Id.* at 589.)  Grossman was to return in one to two weeks for follow up.  (*Id.*)

On May 18, 2020, Grossman saw Dr. Kantharaj for an oncology follow up appointment.  (*Id.* at 555, 558.)  Grossman reported continued unimproved numbness and tingling of her feet, poor memory, constant headaches, and unsteadiness on her feet.  (*Id.* at 555.)  Grossman told Dr. Kantharaj Ritalin was not helping her poor memory, and Cymbalta and Lyrica were not helping her neuropathy.  (*Id.*)  Grossman again denied limb weakness and dizziness but endorsed paresthesias, numbness of hands and feet, anxiety, and poor memory.  (*Id.* at 556.)  On examination, Dr. Kantharaj found no joint tenderness or swelling, no muscle tenderness, no cyanosis, clubbing, or edema, normal judgment and insight, and recent and long-term memory appeared normal for someone of Grossman's age.  (*Id.* at 557.)  Dr. Kantharaj advised Grossman to see a neurologist regarding her peripheral neuropathy and poor memory.  (*Id.* at 558.)

On October 9, 2020, Grossman saw Dr. Kantharaj for oncology follow up.  (*Id.* at 551, 554.) Grossman reported similar symptoms as at her May 2020 appointment, with the addition of occasional

falls.  (*Id.* at 551-52.)  Dr. Kantharaj found similar findings on examination and again advised Grossman to see a neurologist regarding her peripheral neuropathy and poor memory.  (*Id.* at 553-54.)

On October 30, 2020, Grossman saw Dhruv Patel, M.D., for follow up.  (*Id.* at 575.)  Grossman reported things were "about the same" and complained of continued tripping and loss of balance, as well as dropping things out of her hands.  (*Id.*)  Grossman told Dr. Patel it had been a few weeks since she last fell.  (*Id.*)  At her previous appointment, Grossman reported an 80% improvement on Cymbalta.  (*Id.*)  Grossman complained of leg spasms in the evening and constant coldness of her hands and feet.  (*Id.*)  Grossman told Dr. Patel she did not believe Adderall was helping her ADD.  (*Id.*)  On examination, Dr. Patel found normal range of motion, no sensory deficit, no abnormal muscle tone, normal coordination, absent Babinski's sign bilaterally, and abnormal reflexes.  (*Id.* at 578.)  Dr. Patel noted Grossman was no longer responding to Cymbalta, but that Grossman did not want to increase the medication.  (*Id.* at 579.)  Dr. Patel recommended stopping the Adderall to see if it was helping and starting Zanaflex at night to address the hand and leg spasms occurring at night.  (*Id.*)

On November 10, 2020, Grossman saw CNP Ruffner for follow up and ultrasound results.  (*Id.* at 570.)  Ruffner noted the arterial ultrasound was negative for lower extremity arterial disease.  (*Id.*)  Grossman reported her toes and feet are more reddish in color, and this was intermittent, not constant. (*Id.*)  Grossman told Ruffner she continued to have occasional mild ankle swelling that was worse when she was on her feet for long periods of time.  (*Id.*)  Grossman stated the edema was not troublesome.  (*Id.*)  Grossman denied lower extremity claudication, aching, pain, fatigue, and heaviness.  (*Id.*)  Grossman denied weakness but endorsed dizziness, lightheadedness, numbness and tingling in her feet, and headaches.  (*Id.* at 573.)  On examination, Ruffner found no cyanosis of the lower extremities, warmth to the touch of the lower extremities, no dermatitis, pulses palpable to the lower extremities, no erythema,

ulcers, or skin discoloration of the lower extremities, and mild non-pitting edema of the ankles bilaterally.

(*Id.* at 573-74.)  Ruffner noted:

> At this time patient states her symptoms are not troublesome enough that she
> cannot tolerate them and therefore does not wish to proceed with LE Venous
> US scan to evaluate for insufficiency.  Can return in future if LE edema
> becomes troublesome and not controlled with compression stockings.  No
> further follow-up in vascular clinic required.

(*Id.* at 574.)

## C.    State Agency Reports

### 1.    Mental Impairments

On January 10, 2020, state agency reviewing psychologist Maurice Prout, Ph.D., reviewed the file

and determined Grossman had no severe psychiatric impairments.  (*Id.* at 74-75.)

### 2.    Physical Impairments

On August 13, 2019, state agency physician Elizabeth Das, M.D., reviewed the file and determined

Grossman's symptoms were not expected to last 12 months.  (*Id.* at 64.)

On January 21, 2020, on reconsideration, Linda Hall, M.D., determined Grossman's neuropathy

had lasted more than 12 months.  (*Id.* at 77.)  Dr. Hall opined Grossman could occasionally lift and/or

carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about six hours in an eight-hour

workday, sit for about six hours in an eight-hour workday, and frequently push/pull with her bilateral

lower extremities.  (*Id.* at 76.)  Grossman could occasionally climb ramps and stairs, but never climb

ladders, ropes, or scaffolds.  (*Id.*)  Grossman could frequently balance.  (*Id.*)  Grossman had an unlimited

ability to stoop, kneel, crouch, and crawl.  (*Id.* at 77.)  Dr. Hall opined Grossman had no manipulative

limitations.  (*Id.*)

## D.    Hearing Testimony

During the November 12, 2020, hearing, Grossman testified to the following:

- She cannot work full-time because of safety issues and her mind not being what it was before. (*Id.* at 41.) She "zone[s] out" a lot, cannot get words out sometimes, says the wrong thing, and trips and falls a lot. (*Id.*) Her neuropathy from chemotherapy causes her to trip and fall. (*Id.* at 41-42.) Her feet are numb, and she cannot feel them, so she does not know where they are. (*Id.* at 42.) The symptoms stated in November 2018, about two months after she started chemotherapy. (*Id.*) It was one of the reasons she needed to leave her job. (*Id.*) Her symptoms have gotten worse since 2018. (*Id.*) Her hands are numb, and she has a hard time grasping and holding things. (*Id.*) She drops things and it takes her a while to pick them up. (*Id.*) She drops dishes, mail, food, everything. (*Id.* at 42-43.) She thinks she has something in her hand, but when she looks down it is on the ground. (*Id.* at 43.) She can write, but not as well as she used to. (*Id.*) She can button, tie, and zip, although it takes her a while, especially with buttons. (*Id.*) She could pick up change from a tabletop after a couple of tries. (*Id.*) She does not use a cane or walker. (*Id.*) She thinks her doctors are waiting, although she has them. (*Id.*) She holds on to walls, chairs, and counters when walking around her home. (*Id.*)

- Standing for too long causes swelling from her toes to her shins. (*Id.* at 44.) After 30-45 minutes, she can feel her feet getting tight and she gets painful spasms in the bottoms of her feet. (*Id.*) She needs to sit down and elevate her legs for at least two hours. (*Id.*) Whether she has issues sitting depends on what she is doing when she is sitting. (*Id.*) If she does not use her hands while she is sitting, her hands fall asleep and tingle all the way to her elbows. (*Id.*) Her feet remain swollen even after sitting. (*Id.*) Once they are swollen, they stay that way. (*Id.* at 44-45.) She elevates her feet to a height that is comfortable. (*Id.* at 45.) How far she can walk depends on the day, but she can walk for about 20-25 minutes. (*Id.*) She walks at a slower pace. (*Id.* at 46.) She feels off balance all the time. (*Id.*) She can climb stairs, but she has a hard time coming down them because she has to slide her heels on the back of the stairs so she knows where they are since she cannot feel if she is on the correct step. (*Id.*) She falls down the stairs often. (*Id.*) She tries not to go up and down the stairs if she is home alone. (*Id.*) She can do chores around the house; it just takes her a while, and she must take breaks. (*Id.* at 47.) She does the dishes, but a lot of them break because they slide out of her hands. (*Id.*) She cooks, but she cannot cut vegetables with a knife, and she has trouble cutting things. (*Id.*) She could lift 15 pounds. (*Id.*) She has problems stooping and bending at the waist because she gets dizzy if she changes direction quickly. (*Id.*) Her doctors have been trying different medications. (*Id.*)

- She cannot drive. (*Id.*) The last time she drove, she zoned out at a stop sign and snapped out of it when someone beeped at her. (*Id.* at 48.) She cannot feel how much pressure to put on the gas and the brake. (*Id.*) She has a hard time concentrating on television shows and reading. (*Id.*) She forgets her medication most of the time. (*Id.* at 49.)

- She still gets headaches and had one at the hearing. (*Id.* at 48.) She gets headaches a few times a week. (*Id.*) Sometimes her headaches can last for a couple of days. (*Id.* at 49.)

- She does not exercise.  (*Id.* at 50.)  If she does, she sits on a bike, or if she does a walking video, she has to hold onto a chair or the couch.  (*Id.*)

- She takes Cymbalta for chronic pain, Adderall, blood pressure and cholesterol medication, and a muscle relaxer.  (*Id.* at 51.)  She stopped taking Lyrica and Gabapentin because they weren't working.  (*Id.*)  She has no side effects from her medication. (*Id.*)  Adderall is not helping.  (*Id.* at 53.)

- She likes to read.  (*Id.* at 52.)  She does jigsaw puzzles to help with her concentration and hand coordination.  (*Id.*)  She plays Tetris on a Playstation.  (*Id.*)

The VE testified Grossman had past work as a licensed practical nurse.  (*Id.* at 54-55.)  The ALJ then posed the following hypothetical question:

> All right, sir, at this time, I ask that you assume a hypothetical individual with the past job you just described.  I further ask you to assume the hypothetical individual would fall within the exertional category of light but would have the following further restrictions.  The hypothetical individual would be limited to frequent pushing and pulling with bilateral lower extremities.  The hypothetical individual would, on occasion, be required to use ramps and stairs.  Never use ladders, ropes, or scaffolds.  The hypothetical individual would be limited to frequently balancing.  Sir, with those restrictions, would a hypothetical individual be able to perform the past work described earlier in your testimony?

(*Id.* at 55.)

The VE testified the hypothetical individual would not be able to perform Grossman's past work as a licensed practical nurse.  (*Id.*)  The VE further testified the hypothetical individual would be able to perform other representative jobs in the economy, such as cashier II, cleaner/housekeeping, and production assembler. (*Id.* at 56.)

The ALJ modified the hypothetical to limit the hypothetical individual to frequent bilateral handling and fingering.  (*Id.*)  The VE testified the representative jobs previously identified would remain.  (*Id.* at 57.)  The ALJ further modified the hypothetical to add a limitation to simple tasks, limited routine and repetitive tasks.  (*Id.*)  The VE testified the representative jobs previously identified would remain at the same numbers.  (*Id.*)  Finally, the ALJ modified the hypothetical to limit the hypothetical individual to occasional handling and fingering bilaterally.  (*Id.*)  The VE testified the representative jobs previously

13

identified would be eliminated. (*Id.*) The only job that would remain would be that of furniture rental clerk. (*Id.*)

### III.   STANDARD FOR DISABILITY

In order to establish entitlement to DIB under the Act, a claimant must be insured at the time of disability and must prove an inability to engage "in substantial gainful activity by reason of any medically determinable physical or mental impairment," or combination of impairments, that can be expected to "result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.130, 404.315, 404.1505(a).

A claimant is entitled to a POD only if: (1) she had a disability; (2) she was insured when she became disabled; and (3) she filed while she was disabled or within twelve months of the date the disability ended. 42 U.S.C. § 416(i)(2)(E); 20 C.F.R. § 404.320.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process. 20 C.F.R. § 404.1520(a)(4). *See also Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990). First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time of the disability application. 20 C.F.R. § 404.1520(b). Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability. 20 C.F.R. § 404.1520(c). A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923. Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment, or combination of impairments, meets or medically equals a required listing under 20 CFR Part 404, Subpart P, Appendix 1, the claimant is presumed to be disabled regardless of age, education, or work experience. *See* 20 C.F.R. § 404.1520(d). Fourth, if the claimant's impairment or combination of impairments does not prevent her from doing her

14

past relevant work, the claimant is not disabled. 20 C.F.R. § 404.1520(e)-(f). For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled. 20 C.F.R. §§ 404.1520(g), 404.1560(c).

Here, Grossman was insured on her alleged disability onset date, November 23, 2018, and remained insured through December 13, 2021, her date last insured ("DLI"). (Tr. 13-14.) Therefore, in order to be entitled to POD and DIB, Grossman must establish a continuous twelve-month period of disability commencing between these dates. Any discontinuity in the twelve-month period precludes an entitlement to benefits. *See Mullis v. Bowen*, 861 F.2d 991, 994 (6th Cir. 1988); *Henry v. Gardner*, 381 F.2d 191, 195 (6th Cir. 1967).

### IV. SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.   The claimant meets the insured status requirements of the Social Security Act through December 31, 2021.

2.   The claimant has not engaged in substantial gainful activity since November 23, 2018, the alleged onset date (20 CFR 404.1571 *et seq.*).

3.   The claimant has the following severe impairments: polyneuropathy due to drugs and sensory neuropathy (20 CFR 404.1520(c)).

4.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525 and 404.1526).

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except: She can frequently push and pull with the bilateral lower extremities. She can occasionally use ramps and stairs, but she can never use ladders, ropes or scaffolds. She can frequently balance. She can bilaterally handle and finger frequently with the upper extremities.

6.   The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7.      The claimant was born on May **, 1971 and was 47 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8.      The claimant has at least a high school education (20 CFR 404.1564).

9.      Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10.     Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11.     The claimant has not been under a disability, as defined in the Social Security Act, from November 23, 2018, through the date of this decision (20 CFR 404.1520(g)).

(Tr. 16-26.)

## V. STANDARD OF REVIEW

The Social Security Act authorizes narrow judicial review of the final decision of the Social Security Administration (SSA)." *Reynolds v. Comm'r of Soc. Sec.*, 424 F. App'x 411, 414 (6th Cir. 2011). Specifically, this Court's review is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards. *See Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010); *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009). Substantial evidence has been defined as "'more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)). In determining whether an ALJ's findings are supported by substantial evidence, the Court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence. *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

16

Review of the Commissioner's decision must be based on the record as a whole. *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). The findings of the Commissioner are not subject to reversal, however, merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter*, 246 F.3d 762, 772-73 (6th Cir. 2001) (citing *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached."). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen*, 800 F.2d at 545 (citing *Baker v. Heckler*, 730 F.2d 1147, 1150 (8th Cir. 1984)).

In addition to considering whether the Commissioner's decision was supported by substantial evidence, the Court must determine whether proper legal standards were applied. Failure of the Commissioner to apply the correct legal standards as promulgated by the regulations is grounds for reversal. *See, e.g., White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("Even if supported by substantial evidence, however, a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").

Finally, a district court cannot uphold an ALJ's decision, even if there "is enough evidence in the record to support the decision, [where] the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-1300, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the Court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-cv-734, 2011 WL 6130824 (S.D. Ohio Nov. 15, 2011); *Gilliam v. Astrue*, No. 2:10-CV-017, 2010 WL 2837260

17

(E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-cv-1982, 2010 WL 2929562 (N.D. Ohio July 9, 2010).

## VI. ANALYSIS

In her sole assignment of error, Grossman argues that "there is no medical support for the ALJ's conclusion" regarding Grossman's RFC, "and thus the RFC is not supported by substantial evidence." (Doc. No. 7 at 9.)  Grossman asserts that the "only medical opinions" in the record regarding her physical impairments were those of the state agency medical consultants, but there were treatment records post-dating the state agency medical consultants' review of the file.  (*Id.* at 8, 10.)  Grossman argues "the ALJ constructed his RFC without the benefit of any opinion evidence with respect to the functional limitations associated with Plaintiff's peripheral neuropathy, other than to unilaterally conclude Plaintiff was capable of frequent handling and fingering." (*Id.* at 11.)  Grossman faults the ALJ for not recontacting the treating source, ordering a consultative examination, or having a medical expert testify, and argues that the ALJ "should not have fashioned an RFC in the absence of an opinion . . . ." (*Id.* at 11-12.)  Grossman also faults the ALJ for relying on her activities of daily living in determining Grossman was capable of full-time work.  (*Id.* at 12.)  In addition, Grossman asserts the ALJ mischaracterized the record evidence in asserting she was "'responding well to cancer treatment'" and took her activities of daily living out of context. (*Id.* at 12-13.)

The Commissioner responds that Grossman overlooks that it was her burden to provide evidence showing she was disabled, and Grossman fails to identify what additional limitations the ALJ should have included in the RFC but did not.  (Doc. No. 8 at 1.)  The Commissioner argues the ALJ "properly considered all evidence of record, including that coming after the state agency reviewing opinion, and accordingly, his decision was supported by substantial evidence." (*Id.*)  The Commissioner also asserts it was proper for the ALJ to consider Grossman's activities of daily living in evaluating her subjective

18

symptoms, and there was no error in the ALJ considering Grossman's December 2019 report regarding her activities of daily living.  (*Id.* at 13.)

## A.  RFC Determination

The RFC determination sets out an individual's work-related abilities despite his or her limitations. *See* 20 C.F.R. § 404.1545(a)(1).  A claimant's RFC is not a medical opinion, but an administrative determination reserved to the Commissioner.  *See* 20 C.F.R. § 404.1527(d)(2).  An ALJ "will not give any special significance to the source of an opinion on issues reserved to the Commissioner."  *See* 20 C.F.R. § 404.1527(d)(3).  As such, the ALJ bears the responsibility for assessing a claimant's RFC based on all the relevant evidence (20 C.F.R. § 404.1546(c)) and must consider all of a claimant's medically determinable impairments, both individually and in combination.  *See* SSR 96–8p, 1996 WL 374184 (SSA July 2, 1996).

"In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis." *Fleischer*, 774 F. Supp. 2d at 880 (citing *Bryan v. Comm'r of Soc. Sec.*, 383 F. App'x 140, 148 (3d Cir. 2010) ("The ALJ has an obligation to 'consider all evidence before him' when he 'mak[es] a residual functional capacity determination,' and must also 'mention or refute [...] contradictory, objective medical evidence' presented to him.")).  *See also* SSR 96-8p, 1996 WL 374184, at *7 (SSA July 2, 1996) ("The RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted.")).  While the RFC is for the ALJ to determine, the claimant bears the burden of establishing the impairments that determine her RFC.  *See Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).

19

It is well-established there is no requirement that the ALJ discuss each piece of evidence or limitation considered. *See, e.g., Conner v. Comm'r*, 658 F. App'x 248, 254 (6th Cir. 2016) (citing *Thacker v. Comm'r*, 99 F. App'x 661, 665 (6th Cir. 2004) (finding an ALJ need not discuss every piece of evidence in the record); *Arthur v. Colvin*, No. 3:16CV765, 2017 WL 784563, at *14 (N.D. Ohio Feb. 28, 2017) (*accord*).  However, courts have not hesitated to remand where an ALJ selectively includes only those portions of the medical evidence that places a claimant in a capable light and fails to acknowledge evidence that potentially supports a finding of disability.  *See e.g., Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 724 (6th Cir. 2014) (reversing where the ALJ "cherry-picked select portions of the record" rather than doing a proper analysis); *Germany–Johnson v. Comm'r of Soc. Sec.*, 313 F. App'x 771, 777 (6th Cir. 2008) (finding error where the ALJ was "selective in parsing the various medical reports").  *See also Ackles v. Colvin*, No. 3:14cv00249, 2015 WL 1757474, at *6 (S.D. Ohio April 17, 2015) ("The ALJ did not mention this objective evidence and erred by selectively including only the portions of the medical evidence that placed Plaintiff in a capable light."); *Smith v. Comm'r of Soc. Sec.*, No. 1:11-CV-2313, 2013 WL 943874, at *6 (N.D. Ohio March 11, 2013) ("It is generally recognized that an ALJ 'may not cherry-pick facts to support a finding of non-disability while ignoring evidence that points to a disability finding.'"); *Johnson v. Comm'r of Soc. Sec.*, No. 2:16-cv-172, 2016 WL 7208783, at *4 (S.D. Ohio Dec. 13, 2016) ("This Court has not hesitated to remand cases where the ALJ engaged in a very selective review of the record and significantly mischaracterized the treatment notes.").

Regarding Grossman's argument that the ALJ's RFC lacks substantial evidence because it is not based on a medical opinion, the Sixth Circuit has specifically rejected such an argument, finding "the Commissioner has final responsibility for determining an individual's RFC . . . and to require the ALJ to base her RFC finding on a physician's opinion 'would, in effect, confer upon the treating source the authority to make the determination or decision about whether an individual is under a disability, and thus

20

would be an abdication of the Commissioner's statutory responsibility to determine whether an individual is disabled.'" *Rudd v. Comm'r of Soc. Sec.*, 531 F. App'x 719, 728 (6th Cir. 2013). *See also Mokbel-Aljahmi v. Comm'r of Soc. Sec.*, 732 F. App'x 395, 401 (6th Cir. 2018) ("We have previously rejected the argument that a residual functional capacity determination cannot be supported by substantial evidence unless a physician offers an opinion consistent with that of the ALJ."); *Shepard v. Comm'r of Soc. Sec.*, 705 F. App'x 435, 442-443 (6th Cir. 2017).

Grossman also argues the ALJ improperly relied on the opinion of the state agency physician, Dr. Hall, because Grossman "continued to experience complications related to peripheral neuropathy" after Dr. Hall's review in January 2020. (Doc. No. 7 at 10.) However, it is proper for an ALJ to credit a state agency consultant's opinion when it is "supported by the totality of evidence in the record, and the ALJ considered the evidence obtained after the consultant issued his opinion." *Myland v. Comm'r of Soc. Sec.*, Case No. 17-1592, 2017 WL 5632842, at *2 (6th Cir. Nov. 13, 2017). *See also Ruby v. Colvin*, Case No. 2:13-CV-01254, 2015 WL 1000672, at *4 (S.D. Ohio Mar. 5, 2015) ("[S]o long as an ALJ considers additional evidence occurring after a state agency physician's opinion, he has not abused his discretion."); *McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009) (indicating that an ALJ's reliance upon state agency reviewing physicians' opinions that were outdated was not error where the ALJ considered the evidence developed post-dating those opinions).

Here, the ALJ's decision demonstrates he considered the entire record. In the decision, the ALJ included a detailed discussion of the evidence post-dating Dr. Hall's opinion. (Tr. 21-23.) Moreover, in analyzing Dr. Hall's opinion, the ALJ stated he had "added additional limitations to account for the claimant's most recent treatment and subjective complaints, i.e., frequent bilateral handling and fingering with the upper extremities." (*Id.* at 24.) Nowhere in her brief does Grossman state what additional limitations should have been included in the RFC. (Doc. No. 7 at 8-14.)

In addition, as the Commissioner correctly states, Grossman bore the burden of providing evidence showing she was disabled, and as Grossman was represented by counsel at the hearing level, the ALJ did not have a heightened burden to develop the record.  In the Sixth Circuit, it is well established that the claimant—not the ALJ—has the burden to produce evidence in support of a disability claim.  *See, e.g., Wilson v. Comm'r of Soc. Sec.*, 280 F. App'x 456, 459 (6th Cir. 2008) (citing 20 C.F.R. § 404.1512(a)).  *See also Struthers v. Comm'r of Soc. Sec.*, 1999 WL 357818 at *2 (6th Cir. May 26, 1999) ("[I]t is the duty of the claimant, rather than the administrative law judge, to develop the record to the extent of providing evidence of mental impairment."); *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) ("The burden of providing a complete record, defined as evidence complete and detailed enough to enable the Secretary to make a disability determination, rests with the claimant. 20 C.F.R. §§ 416.912, 416.913(d).");  *cf. Wright–Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 396 (6th Cir. 2010) (although an "ALJ has an inquisitorial duty to seek clarification on material facts," a plaintiff, who is represented by counsel, must provide a "factual record" relating to the length of his employment when his past work was part of the record and was the basis of the initial decision to deny benefits).  There is only a special, heightened duty requiring the ALJ to develop the record when the plaintiff is "(1) without counsel, (2) incapable of presenting an effective case, and (3) unfamiliar with hearing procedures." *Wilson*, 280 F. App'x at 459 (citing *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051–52 (6th Cir. 1983)).

Furthermore, 20 C.F.R. § 404.1520b does not require an ALJ to take the actions outlined in the regulation but, rather, grants an ALJ discretion to do so if he or she deems it necessary under the circumstances presented.  *See Landsaw*, 803 F.3d at 214 ("the regulations do not require an ALJ to refer a claimant to a consultative specialist."); *Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) ("An ALJ has discretion to determine whether further evidence, such as additional testing or expert testimony, is

22

necessary."); *McClellan v. Comm'r of Soc. Sec.*, Case No. 16-12676, 2017 WL 5054275, at *3 (E.D. Mich. Sept. 29, 2017) ("ALJs are not required to order consultative examinations, but merely have the discretion to do so if necessary"); *Peterson v. Comm'r of Soc. Sec.*, Case No. 1:16-cv-363, 2017 WL 343625, at *3, n. 2 (W.D. Mich. Jan. 24, 2017) ("Although it is within the discretionary power of an ALJ to order a consultative examination, it is not required and may be ordered when 'the evidence as a whole, both medical and nonmedical, is not sufficient to support a decision on [the] claim.'"). *See also Ruby v. Colvin*, Case No. 2:13-cv-01254, 2014 WL 5782930, at *13 (S.D. Ohio Nov. 6, 2014) (an ALJ's "determination of whether a medical expert is necessary is inherently a discretionary decision."); *O'Neill v. Colvin*, Case No. 1:13 CV 867, 2014 WL 3510982, at *18 (N.D. Ohio July 9, 2014) ("ALJs retain discretion as to whether to call a medical expert"). *See also Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010); *Simpson v. Comm'r of Social Security*, 344 F. App'x 181, 189 (6th Cir. 2009); *Vanderhoff v. Comm'r of Soc. Sec.*, Case No. 1:16-CV-156, 2016 WL 6211442, at *3 (W.D. Mich. Oct. 25, 2016); *Hudson–Kane v. Berryhill*, 247 F. Supp. 3d 908, 915–916 (M.D. Tenn. 2017).

There is no error.

## B.    Subjective Symptom Analysis

When a claimant alleges symptoms of disabling severity, the ALJ must follow a two-step process for evaluating these symptoms. *See e.g., Massey v. Comm'r of Soc. Sec.*, 409 F. App'x 917, 921 (6th Cir. 2011). First, the ALJ must determine if there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce a claimant's symptoms. Second, the ALJ "must evaluate the intensity and persistence of [the claimant's] symptoms so that [the ALJ] can determine how

[those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. § 404.1529(c)(1). *See also* SSR 16-3p,[3] 2016 WL 1119029 (March 16, 2016).

If these claims are not substantiated by the medical record, the ALJ must make a credibility[4] determination of the individual's statements based on the entire case record. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 248 (6th Cir. 2007) (noting that "credibility determinations regarding subjective complaints rest with the ALJ"). The ALJ's credibility findings are entitled to considerable deference and should not be discarded lightly. *See Villareal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987). Nonetheless, the ALJ's "decision must contain specific reasons for the weight given to the individual's symptoms ... and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2016 WL 1119029; *see also Felisky*, 35 F.2d at 1036 ("If an ALJ rejects a claimant's testimony as incredible, he must clearly state his reason for doing so").

To evaluate the "intensity, persistence, and limiting effects of an individual's symptoms," the ALJ must look to medical evidence, statements by the claimant, other information provided by medical sources, and any other relevant evidence on the record. *See* 20 C.F.R. § 404.1529; SSR 16-3p, 2016 WL 1119029 (March 16, 2016). Beyond medical evidence, there are seven factors that the ALJ should

---

[3] SSR 16-3p superseded SSR 96-7p, 1996 WL 374186 (July 2, 1996) on March 28, 2016. Thus, SSR 16-3 was in effect at the time of the November 12, 2020 hearing.

[4] SSR 16-3p has removed the term "credibility" from the analysis. Rather, SSR 16-3p directs the ALJ to consider a claimant's "statements about the intensity, persistence, and limiting effects of the symptoms," and "evaluate whether the statements are consistent with objective medical evidence and other evidence." SSR 16-3p, 2016 WL 1119029, at *6. The Sixth Circuit has characterized SSR 16-3p as merely eliminating "the use of the word 'credibility' ... to 'clarify that subjective symptom evaluation is not an examination of an individual's character.'" *Dooley v. Comm'r of Soc. Sec.*, 656 F. App'x 113, 119 n.1 (6th Cir. 2016).

consider.[5]  The ALJ need not analyze all seven factors but should show that he considered the relevant evidence.  *See Cross*, 373 F. Supp. 2d at 733; *Masch v. Barnhart*, 406 F. Supp. 2d 1038, 1046 (E.D. Wis. 2005).

Here, the ALJ acknowledged Grossman's testimony and other statements regarding her symptoms and limitations, including her difficulties in doing activities of daily living and the things she used to do. (Tr. 18.)  The ALJ determined Grossman's medically determinable impairments could reasonably be expected to cause "some discomfort and functional limitations."  (*Id.* at 19.)  However, the ALJ found her statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record.  (*Id.*)  Specifically, the ALJ found as follows:

> The claimant's allegations are partially consistent with respect to the nature of her symptoms. However, her allegations that her symptoms are so severe that she cannot perform work at substantial gainful activity levels are not consistent in light of the evidence of record and activities consistent with the ability to perform a range of light work. The claimant alleged disability due to complications secondary to chemotherapy. Although the undersigned found the claimant to have severe impairments, they are not work preclusive. She reported symptoms of dizziness, headaches, pain, tingling, loss of sensation, and weakness. However, the claimant is responding well to cancer treatment. Evidence of record regarding the claimant's daily activities is consistent with a residual functional capacity for light work. Typical day activities include letting out the dog and eating breakfast. During the day she might wash dishes, vacuum, do a load of laundry, feed, and water the dog. Her hobbies are reading, solving word games and following sports. She has about 10 friends that she stays in touch with. She prepares supper for the family. She watches television.

---

[5] The seven factors are: (1) the individual's daily activities; (2) the location, duration, frequency, and intensity of the individual's pain; (3) factors that precipitate and aggravate the symptoms; (4) the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) any measures other than treatment the individual uses or has used to relieve pain or other symptoms; and (7) any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.  *See* SSR 16-3p, 2016 WL 1119029, at *7; *see also Cross v. Comm'r of Soc. Sec.*, 373 F. Supp. 2d 724, 732–733 (N.D. Ohio 2005) (stating that an ALJ, in a unified statement, should explain his or her credibility findings in terms of the factors set forth in the regulations, thereby permitting the court to "trace the path of the ALJ's reasoning.")

> She shops for groceries and runs various errands on the weekends. However, to the extent that she is self-limited, this does not in itself establish a medical or pathological basis for such restrictions, nor is the record consistent with her alleging an incapacity for all sustained work activity. There is no evidence that the claimant's use of prescribed medication is accompanied by side effects that would interfere significantly with her ability to perform work within the restrictions outlined in this decision. No treating source refers to the claimant as having incapacitating or debilitating symptoms that would prevent her from returning to the workplace at a reduced level of exertion such as in the performance of light work, or has otherwise described the claimant as "totally and permanently disabled" by her impairments and complaints. In summary, the evidence does not corroborate the claimant's allegations of symptoms attributed to her impairments to an extent that would preclude the performance of light work with the restrictions stated above.

(Tr. 24.)

Regarding Grossman's argument that the ALJ mischaracterized the evidence regarding her response to cancer treatment, the record shows Grossman's treatment providers repeatedly noted she tolerated her cancer treatment well, except for some side effects, including peripheral neuropathy.  (*Id.* at 336, 214-24, 479-537.)  Grossman completed chemotherapy in February 2019 and radiation in April 2019. (*Id.* at 335, 543.)  While Grossman continued to have peripheral neuropathy because of her chemotherapy treatment and continued to meet with her oncologists after her course of chemotherapy and radiation ended, she points to no evidence that she was not responding well to her cancer treatment.

Regarding Grossman's argument regarding her activities of daily living, an ALJ can consider a claimant's activities of daily living when assessing symptoms. *Keeton v. Comm'r of Soc. Sec.*, 583 F. App'x 515, 532 (6th Cir. 2014) ("Although the ability to do household chores is not direct evidence of an ability to do gainful work, see 20 C.F.R. § 404.1572, '[a]n ALJ may...consider household and social activities engaged in by the claimant in evaluating a claimant's assertions of pain or ailments.'") (internal citations omitted)).  In addition to resolving conflicts in the medical evidence, the ALJ used Grossman's activities of daily living to partially discount her testimony regarding the level of severity of her symptoms. *See Phillips v. Comm's of Social Sec.*, No. 5:20 CV 126, 2021 WL 252542, at *10 (N.D. Ohio

Jan. 26, 2021).  Furthermore, the ALJ's extensive discussion of the relevant medical evidence included several findings that undercut a finding of disability.  (Tr. 18-24.)  Contrary to Grossman's assertion, the ALJ did not take her activities of daily living out of context; rather, he determined any self-limitation could "not in itself establish a medical or pathological basis for such restrictions" and such self-limitations were unsupported by the record.  (*Id.* at 24.)

There is no error.

## VII. CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED.**

Date: December 9, 2022                     *s/ Jonathan Greenberg*
                                         Jonathan D. Greenberg
                                         United States Magistrate Judge

27